CULBERTSON, ET AL, vs. MATSON, ET AL.

A. and others having filed a bill in chancery to compel B. to convey lands alleged to have been purchased by B. in trust, B. prepares an answer, makes oath to it and is about to file it when the bill is dismissed. Some years after this, B. having died, another bill is filed for the same purpose by the same parties, against the heirs and representatives of B. *Held:*

1. It appearing that many of the transactions must have been known exclusively to B. and unknown to his heirs, they should be permitted to make the answer thus prepared by B. a part of their answer and evidence in their favor.

2. If A. place money in the hands of B. to purchase land for the benefit of C., on a refusal by B. to convey the land thus purchased to C. a bill to enforce such trust could not be brought by A., but only by B. the *cestui que trust.*

3. Nor could A. devise the land thus purchased so as to enable D. the devisee, to compel a conveyance to himself.

4. If D claim a conveyance from B. under a transfer of C.'s equitable right, C. must be made a party to the bill.

## APPEAL from Marion Circuit Court (In Chancery.)

CARTY WELLS, *for Appellants.*

1. Complainants claiming title to the land sued for under the will of James Matson, should have made the executors of said will parties.

2. If they claim under deed of Robert Matson, he should have been made a party.

3. There was no claim in the bill for rents, and nothing said in the bill about improvements, there should therefore have been no evidence heard or decree given for rents.

4. Complainants claim under the will of James Matson and the deed of Robert Matson—each of which instruments give them two-thirds of the land, and the other third to Richard. The decree is therefore erroneous in giving it all to complainants.

5. The evidence is insufficient to warrant the rendering of any decree for complainants.

GLOVER & CAMPBELL, *for Appellees.*

1. The most unfavorable view which can be taken of the subject for the complainants, will show that Richard Matson received of his father $4.861, to be laid out in lands in Missouri. See the testimony at pages 70, 74 and 76 of the record.

2. The same testimony establishes the fact as it seems to us that the lands in controversy were purchased with $2,056, of this money. The statements of Richard, verbal and written, for ten or twelve years after receiving the money are to this effect, and the lands are well identified.

3. What disposition was made of the remainder of the money, $2,805, is not shown. It is true, that the answer of Richard Matson, which was exhibited by the defendants, contain a reference to other lands which *he says were bought,* but what specific lands they were—where situate—what they were worth—what was the character of the title, if any—and if not, what care and diligence the trustee had used in the investment of the money (matters which were not at all in the power of the complainants,) we are unable to discover from the answers. It will be also remarked that no evidence of any sort was introduced by defendants to prove the vague and loose statements in the answers.

4. Under these circumstances, the safest course for the circuit court to pursue, was to treat the $2,805 as remaining unexpended in the hands of the trustee. In fact, nothing else could be done. It was impossible to render any decree touching the lands barely alluded to, but not described by the answer.

5. That Robert Matson's title to these lands and any portion of the money remaining unexpended in the hands of the trustee, passed by the will. Because, having been directed to be laid out in lands, the 4,681 dollars, if not so laid out, would be regarded as lands so far as to pass by the devise. 1 Mad. Chy., 365; 2 ibid., 121.

6. The lands named in the bill, and the money in the hands of the trustee were then the subject matter of the decree. The court decreed the lands to the complainants and left the remaining subject matter in the hands of the trustee as his share of the devise. The power of the Chancellor

to make such a decree cannot be questioned. 2 Kinne's Comp., 296; 1 Story's Eq., 608, 610.

7. The heirs and legal representatives of Richard Matson were favored by this decree, since it is a fair presumption that $2,804 have been as valuable to him as $2,056 have been to complain-ants. If such has not really been the fact, it is to be presumed that it would have been shown in the answers.

8. One of the infant heirs of Richard Matson who had appeared by guardian, attained full age pending the bill; no order was taken, but the cause progressed without noticing the fact, and this was in conformity to the practice both English and American. 1 Edwards on Parties, 194, 200; Smith's Chy. Pr.

McBRIDE, J., delivered the opinion of the Court.

Samuel S. Matson and others, filed their bill in chancery in the Marion Circuit Court against the administrator and heirs of Richard Matson, deceased, in which they allege, that between the years 1816 and 1825, James Matson, then residing in Bourbon county, Ky., wishing to buy lands for himself and some of his children in the State of Missouri, placed in the hands of his son Richard Matson, at different times near $10,000; that amongst other sums, enough to purchase 1,000 acres of land, for and in the name of Robert Matson, son of said James, to be located near Palmyra in this State. The bill further charges, that the said Richard, with the funds placed in his hands by his father proceeded to enter lands at the land office, and to purchase and locate New Madrid certificates for a large quantity of land lying in Marion county. The first title papers for said land were in the name of his brother Robert, but those subsequently taken were in his own name, and that he took possession and has continued to hold the same in his own name and right.

It is further alleged, that in the year 182—, the said James Matson departed this life, in Bourbon county, Ky., having previously made his will, which was proven and admitted to record in said county and State, and afterwards, on the 21st November, 1828, the same was recorded in Marion county, in the State of Missouri; that by said will James Matson, deceased, devised certain real estate in Kentucky to his son Robert, and provided that his said son Robert should give up all his claims to lands and salt works in the State of Missouri to be the equal property of his sons Richard, Enoch, and the heirs of Peyton Matson, deceased.

That the said Robert Matson, on the 11th August, 1838, by deed, relinquished all of his right and interest in the lands in Missouri, to the parties aforesaid; that on the 18th February, 1841, Robert Matson, by deed, conveyed one undivided third part of his interest in said lands and salt works to his brother, Enoch Matson; one other third part to the heirs of Peyton Matson, deceased, and the remaining third part to Rich-

32

ard Matson. (Then follows the conveyances from some of the heirs of Peyton Matson, deceased, to some of the present complainants, which it is not necessary to notice.) That about two years prior to the commencement of this action, the complainants brought their bill against the defendant, Richard, but were compelled to dismiss the same, being unable to obtain the necessary documentary and other testimony. That Richard Matson completed his title to a portion of the lands purchased as before stated, and holds inchoate title to the remainder.

That when said Richard Matson was purchasing the lands described in the bill, he avowed that he was making the same for his brother Robert, and the lands for many years were called and known as Robert Matson's. That Richard through a series of years, in his correspondence with his father and brother, admitted his brother's right to the land, and indignantly repelled the idea that he intended to act in bad faith. That in March, 1837, said Richard Matson proposed to his brother Enoch to meet him and the other complainants in Palmyra and adjust the matter with them, but that he failed to do so. That Richard Matson departed this life on the — day of — 18—, leaving a widow and two children, and that letters of administration have been granted to two of the defendants, all of whom refuse to convey the lands to the complainants. All of the parties in interest under Richard Matson are made defendants, and the bill prays for general relief, &c.

Deademia Fuller, formerly Matson, answered, denying that her late husband, Richard Matson, ever obtained any funds from James Matson to enter lands in the name of said James, in the State of Missouri. She admits that her late husband received near $5,000 to enter lands in Missouri, but in consequence of the credit system which then prevailed, her husband was to enter the lands in his own name and manage the transaction until the titles were consummated. That she was present at an interview between her husband and his father in 1822, when the former was giving the latter an account of his actings and doings on the subject, and stated that his brother Peyton was dissatisfied with the lands entered for him, and preferred purchasing a tract of land from one O'Hara, and had made a contract with O'Hara for said land and had desired her husband to advance the purchase money for the same, and in accordance therewith her husband had advanced $500, and became security for $1,000, the balance of the purchase money. That said James expressed some dissatisfaction at first, to this arrangement, on the ground that by placing the lands in the hands of Peyton, his widow would be entitled to a dower estate therein; but that said James afterwards

ratified the act of her said husband. That she was also present at an interview had between her said husband, his brother Robert and their father James, when her husband stated to Robert that he hoped no advantage would be taken of him in consequence of his permitting Robert to select the Lear tract of land, when Robert came to Missouri, on which tract some improvements had been made for Robert; that he was willing, although the said tract had been entered with his own funds, to let Robert have it, but that he was unwilling now that Robert had declined moving to Missouri, to give the same privilege to the rest of the heirs; when both Robert and James Matson then stated that there should be no difficulty on the subject, and it was then agreed that no claim should be set up against her husband for said tract of land. That the lick tract was mentioned as having been purchased by her husband with the money furnished by his father—it cost about $2,000, besides the kettles which cost between 5 and $600. That this appropriation of the funds by her husband, was under the direction of his father. She does not recollect the several tracts mentioned by her husband as having been purchased with the funds of said James, she believes that the first tract mentioned in the bill was not finally bought, but that the certificate of purchase was used to purchase a place for Enoch Matson, which cost $800, and a deed has been made to him for the same. That she is informed and believes that her husband also purchased of one Hempstead a tract containing about one hundred and fifty acres at the price of $750, which is all the lands within her knowledge purchased with the funds of said James; there could not be much more, for the lick tract at $2,000, the kettles at 5 or $600, the tract purchased for Enoch and the advance of $500 to Peyton, make up the sum of about $4,550. She insists that her husband, for the agency aforesaid, never received any compensation except 40 or $50, for travelling expenses.

The administrators, James Culbertson and William H. Vardeman, and the guardian of the minor heirs of Richard Matson, deceased, in their answer, say, that they have no personal knowledge of the transactions set forth in the bill—they heard Richard Matson in his lifetime, and his wife since his death, speak upon the subject, and the substance of what they then stated is set forth in the answer of Mrs. Fuller, and the sworn answer of Richard Matson, deceased; the latter answer having been prepared to a former bill filed by the complainants, against the said Richard Matson, prior to his death, and which they make a part of their answer. The respondents insist, that the said answer, under the circumstances attending the transaction, should be taken as far as the same

is responsive to the allegations in the bill, as of the highest grade of testimony, for the said Richard was alone acquainted with all of the transactions connected with the subject matter of the bill. They further insist, that the demand is stale, and the fact that the complainants instituted their bill in the lifetime of the said Richard, and when he had prepared his answer thereto, voluntarily abandoned their suit, and have slept upon their rights until his death, are circumstances against the fairness and equity of their claim.

Richard Matson, in his answer to the former bill, states, that he admits the death James Matson and the publication of his will as averred in the bill. That as to the charge that he was employed to enter land for, and in the name of his father, it is untrue; it is likewise untrue that his father ever entrusted to him the sum of $10,000, or any other sum for the purpose set forth in the bill; it is untrue that he ever entered any lands for his father or with his funds, which he fraudulently contrived to dispose of, either absolutely or in secret trust for his own use; it is likewise untrue that the five tracts of land specified in the bill, were ever entered by him with the funds of his father; it is untrue that he has withheld the titles of any lands, entered by him for his father, either from his father during his life or since from his heirs. The respondent further states, that he has no knowledge of any deed of release from Robert Matson to himself—he has never seen it, nor was it ever delivered to him, nor did he ever hear of it until he read it in the bill. He knows of no conveyance from James Matson to Robert, though he knows that his father intended a portion, and much the largest portion of his lands in this State for his son Robert. He repels all imputation of fraud made against him in the bill.

The answer then proceeds to give the following summary of the actings of the respondent on the subject embraced in the bill of the complainant. In the year 1818, the respondent being a citizen of Missouri and on a visit to his father in Kentucky, was requested by his father to enter or purchase land for him, after he, respondent, had completed his own purchases, the land to be entered or purchased in respondent's name and at his discretion, but to procure the lick tract first, and reserve funds enough to carry on the manufacturing of salt. For this purpose, $400 was advanced by his father in money, $1,500 was sent by Thornton Matson to him at St. Louis, $2,800 was received of a debtor of his father residing in Lexington, Ky., and $106 was received of a Mr. Booth likewise a debtor of his father, making a sum total of $4,806; out of this amount, Robert Matson was first to have $1,500, or the proceeds of $1,500

when he came to Missouri, which he then expected shortly to do. Afterwards, Robert Matson sent him $160, to make an improvement preparatory to his removal. This difference made in Robert's favor, was intended to make him equal to the other children who had received some advances. Robert however, declined coming to Missouri, and his father gave him a large real and personal estate in Kentucky which produced a change in his father's will. In addition to the above sums his father handed him $40 to pay a portion of his travelling expenses on one of his trips to Kentucky.

That according to the directions of his father, respondent purchased the lick tract containing one hundred and twenty-five appens of one Chas. Freemon De Lorrie for the sum of $2,000, and appropriated $500 of said funds to the purchase of kettles. He likewise bought with his father's funds a New Madrid claim containing one hundred and fifty acres of C. S. Hempstead, at the price of $750. He also advanced out of the same funds for his brother Peyton $500 for a tract of land purchased of Wm. O'Hara, and became his security for the remainder, of $1,000, of which sum he has been compelled, as such security, to pay $772 13. The five hundred dollar payment was sanctioned by his father—the other sum has been paid since the death of his father. That with the remainder of the funds, he entered lands under the credit system, which required one fourth to be paid at the time and the balance in annual instalments—one tract in Pike county of one hundred and sixty acres, at the price of $2 06 per acre. $82 40 was paid by Peyton Matson and the remainder paid by respondent with certificates of other lands purchased with said funds, being $247 20, and the land heretofore conveyed by him to Peyton's heirs. That with certificates of purchase, consolidated under an act of Congress, he paid $800 for the land on which Enoch Matson resides and deeded the same to him.

The respondent further states, that in 1819 he visited Kentucky, and reported to his father his actings and doings as aforesaid, and that his father approved of the same; that he then offered to make to him a deed for the lick tract, and tendered to him the certificates of the purchase of the lands made by him, but that his father refused to receive either, stating that he wished the title to remain in respondent's name, as his wife might outlive him, and claim dower; and besides, it was uncertain whether he would be able to retain all of the certificates by paying out the lands, and it might become necessary to consolidate and sell some to secure the remainder, &c. That a statement of the amount placed in his hands by his father, was given by his father to Enoch Matson, who made

a memorandum thereof, which respondent now has in his possession, and that he has stated truly all the several sums advanced as aforesaid, and that all of his disbursements as aforesaid received the express sanction of his father.

The respondent further states, that he cannot now state the tracts, or number of tracts, for which he held certificates, but that he has truly stated every tract not surrendered to the government, which was bought with the funds aforesaid; that he has been always ready and anxious, and has frequently requested the heirs of Peyton Matson, and all interested, to take a deed of conveyance for their portion of the lands purchased with his father's funds, and not previously conveyed, but they have declined doing so, under the unjust pretext of being entitled to lands purchased by him with his own money. That for all his trouble and expense in attending the land sales at St. Louis, in selecting lands, and in travelling to and from Kentucky—in a word, for all the money, time and labor consumed in consummating titles, procuring deeds for others in this behalf, he has never received one cent, unless the $40 charged in the bill as trust funds can be so considered. That he is now as ever he has been, ready to account with complainants and convey to them any lands which they may be entitled to, but it will be seen that Peyton and Enoch have both received in lands their due proportion of the proceeds of all funds confided by his father to him, to say nothing about the $772 he had to pay for lands for Peyton, which his heirs have since enjoyed and sold.

Replications were then filed to the several answers filed to the bill of the complainants. Afterwards, on motion of the complainants, leave was given them to amend their bill, and the cause was set for hearing at the next term. No amended bill was filed.

The testimony introduced on the part of the complainants, consisted:

1. Of title papers, by which it appears that the land described in the bill, and charged to have been purchased by Richard Matson for his brother Robert, with the funds of their father, was purchased in Richard's name, except one tract, the notice of the location of which was in the name of Robert Matson.

2. The will of James Matson, by which he bequeathed a large property in the State of Kentucky to his son Robert, provided "Robert give up all claim to the lands and salt works in the State of Missouri, to be the equal property of my sons Richard, Enoch, and the heirs of my deceased son Peyton."

3. The deed of Robert Matson, dated 14th August, 1838, releasing all his interest in and to the lands in the State of Missouri, purchased by

Richard, to Richard, Enoch, and the heirs of Peyton Matson, deceased.

4. The conveyance from Peyton Matson's heirs to certain of the complainants in the bill.

5. A letter from Richard Matson, deceased, to his father, dated 20th September, 1818, in which he says—"I shall locate 320 arpens of land for brother Robert; I think it is the best situation I have ever seen for a farm; it is first rate soil, adjoining a large prairie, a fine spring, and the land equal to any in Bourbon county, and not far from the Mississippi; and I shall locate the 200 arpen tract for him on some situation for a town or mill seat, as I may judge best; if Robert prefers any other lands that I should buy for myself or father, he can have them."

6. Another letter under date of the 13th Sept., 1822, in which he says: "Agreeably to your request, I send you a list of the lands purchased for brother Robert:—

| | | | | |
|---|---|---|---|---|
| 200 arpens at | $2 | per arpen, | $400 | |
| 330 " | 3 | " - " | 990 | |
| 178 34.100 acres | 2 50 | per acre | 446 | 75 |
| 178 34.100 " | 6 | " " | 219 | 75 |

$2,056 50

has formerly been paid, and the remainder two hundred dollars for the succeeding payments. I am at a loss for as complete a list of the quantity, as the papers are sent on for patents, and I only hold a memorandum of what moneys are payable, and at what time to be paid. I believe the quantity purchased are more than what I have stated, as the patents will more fully show."

7. Another letter dated 29th August, 1823, addressed to Robert Matson, in which he says: "It is reported that father has clipped me short by his will, as well as one of the rest, which I hope is not the case; the confidence which has been placed in me is still held sacred, and shall be while I live. I will surrender every thing to father that I have, that he wishes me to do; I will convey all the lands which he authorized me to buy, to any person he may direct me. I have a great desire to get that tract of land of Robert's in this country, as the land where I have selected for myself is disputed, and what will be the result I cannot tell, and if I get that place of Robert's I shall be settled for life. You will be so good as to let me know, as I may clear it out of the office."

8. Another letter addressed to James and Robert Matson, dated 24th December, 1824, wherein he says—"I presume from a letter Enoch received the other day from Robert, that there is a great deal of uneasiness

in the minds of you both respecting the land that I purchased in this country for Robert; fears and doubts have been expressed that I have a disposition to prove traitorous and betray my trust, which I do deny; all these things it appears has taken a strange course since I was in Kentucky, as a proposition was made by Robert and myself, as he was not disposed to live in this State, and that I had through the abuse of my neighbors, selected a tract of land for Robert; that he was willing to let me have his land here, and to be paid in part as far as my interest should be in father's land in Kentucky at his death, relying on the promise of father, that at his death there should be an equal divide of all his property amongst all his children except one; at the time this proposition was made father objected, observing that he was not able to give one of his children that much, and was unwilling for such an arrangement to be made by us, which I did not conceive there could be any inequality, if father should do as he said he would. From the affection and tender regard I had for you, I did propose taking charge of your business. I have made an arrangement to pay Robert's land out of the office, or at least I shall do so."

9. A letter from Richard to Robert Matson, dated 1st May, 1825, in which he states—"I received a letter from brother Robert, stating that he would let Enoch and myself have his land in this country for the interest I hope we have in this country. It is true I wish to have the land here, as the place I now live on is in dispute, and the result of it is unknown. I have consulted Enoch, and he is willing to take the land with me, although he is not willing to allow any more for the land than it cost; he feels doubtful of the title; you will let me know what you would think would be the difference betwixt my interest in father's land and your land here, and I will pay Enoch, as he has no wish to live there. I would advise you not to bind yourself in the conveyance, as there is some danger in the winding up; you will take every thing into consideration, and let me know what you think is the difference; the land here has cost something upwards of $2000, and you may consult father and know what he may think should be the difference, as it has all been bestowed by his goodness, and I wish the same to be left to him."

10. A letter from Richard to Enoch Matson, dated 29th May, 1837, wherein he says—"My health is so much improved that I am able and willing to adjust all the claim of money and land that I may possess through the means of father's money, and am willing to account to you and Peyton's heirs for every dollar that was placed in my hands by father, and pay every particle of land or money according to father's will;

it will be necessary to have T. Anderson as agent of Peyton's heirs, to carry into effect this arrangement; it will be difficult to find Anderson at leisure until the last Friday in April, which time I would propose to meet you in Palmyra; if this arrangement will suit you let me know the same, and I will attend on that day."

11. The deposition of Robert Matson, who testifies, that between the years 1816 and 1821 his father, James Matson, deceased, gave to his brother Richard, also now deceased, the sum of $4,861, for the purpose of purchasing lands in the State of Missouri for the said James, and the deponent, Robert. That said Richard went to Missouri, and shortly thereafter wrote to his father and the deponent that he had appropriated the funds aforesaid as directed, and that part of the lands purchased by him for the deponent lay near a large prairie, and part of which was located with a New Madrid certificate. In the year 1821, this deponent visited the State of Missouri, and was shown by his brother Richard the land which he informed him he had purchased for deponent, and which he said contained between 900 and 1000 acres, after relinquishing some part of the purchases which he had made, on account of having given too much for the land. He does not know how much was relinquished by Richard, but the balance of the money remaining in Richard's hands, after said relinquishment, and after paying for the aforesaid tract, Richard agreed to apply to the purchase of more land for this deponent. The aforesaid tract of land was situated on Bear creek, adjoining a large prairie, about five miles east of south of the town of Palmyra, in the State of Missouri, about eight or ten miles west of Hannibal, on the Mississippi river, and on what was called the State road, with a good sized spring breaking out under a hill in the timber, on the right hand side of the road going to Palmyra, with a good building situated above the spring on the south side. There was an old man named Thomas M. Lair, living adjoining the above described tract of land, on the left hand side of the road and nearly opposite. The above tract of land was to have been purchased in the deponent's name, and was acknowledged by Richard as deponent's land. That whilst in Missouri, Richard had in his possession the certificates of purchase of the said lands, and commenced to transfer or assign them to the deponent, but he agreed to let them remain as they were, in order that Richard might make the proposed relinquishment to the government, without the necessity of a power of attorney from deponent. Richard promised to make a transfer of the lands to deponent when required to do so. The said Richard never did to the knowledge of deponent return any of said money to his father. The

following is a statement made out by Richard of the moneys received by him of his father:

| | |
|---|---:|
| For New Madrid claim, | $400 |
|   " money to be expended for brother Thornton in land, who was under age, and died before it was expended, | 1500 |
|   " money received of Brand by Jas. Matson's order, | 2815 |
|   " do received of Booth per Jas. Matson's order, | 106 |
|   " do received of James Matson, | 40 |
| | $4,861 |

| | | |
|---|---:|---:|
| By cash paid for salt lick in Missouri, | $2000 | |
|   " do. paid for salt kettles, | 500 | 2500 |

Balance,     $2,361

which the said Richard agreed by his father's direction, to invest in lands in Missouri for the deponent. That after the purchase of the tract of land on Bear creek, there still remained in Richard's hands some hundreds of dollars to be applied by Richard in the purchase of more land for the deponent, but which Richard never accounted to him for. That James Matson died in 1825 or 1826, and by will devised deponent certain lans in Kentucky, on condition that he would release all claim to the lands bought for him by Richard in Missouri, to Enoch Matson, Richard Matson, and the heirs of Peyton Matson, deceased, which release this deponent has made, and he also releases all claim to the money, or any part thereof, which remained in Richard Matson's hands unexpended. That Richard several times applied to deponent to purchase of him the tract of land lying on Bear creek.

12. The deposition of Henry G. Feagan, who testifies, that at the first sale of relinquished lands at Palmyra, Richard Matson told him that Robert Matson might influence his father to make an unequal division of his estate among his children, and in that event the purchase of lands had been made in such a manner as that the boys could so arrange it as to recompense themselves; that is, Richard, Enoch and Peyton Matson. The lands alluded to lie about five miles south of Palmyra, on the road leading from Palmyra to New London, and are adjoining Polly Lears, and known as the Matson tract.

13. The deposition of Moses D. Bates, who testified, that in July, 1818, he became acquainted with Richard Matson, who told him that he was purchasing lands for his father, and had about $9000 of his father's mo-

hey in his hands for that purpose. At the land sales deponent took Richard to O'Hara, of whom he purchased a New Madrid certificate—one in the name of Robinson—a part of which claims were located on sections 19 and 30, in township 57, range 5, west. He also purchased of Hempstead a New Madrid claim of 150 acres, which was located on the n. e. 23, 59, 6. He then purchased 320 acres, being the s. w. 13, and s. e. 14, same township and range, and paid one-fourth thereon. Richard then sold his certificates to deponent, who paid out the lands from the office. He then offered to purchase of Richard that part of the New Madrid claim in section 23, above referred to, but Richard said he could not sell it, as it was purchased with the moneys of his father. He also told deponent that the lands in section 19 and 30, were also purchased with the money of his father for his children.

14. The deposition of William Ritchie, who testified, that in the winter of 1818–19, he took a New Madrid certificate to St. Louis for Richard Matson, and it was located on section 30, township 57, of range 5. He understood from Richard Matson that it was located for himself and his father's children, and that he had purchased various tracts of land with money sent out by his father.

15. The testimony of Thomas and John Lear, who prove that their father entered on the land in 1820, as the tenant of Richard Matson, and continued to reside there until his death, and since that, their mother has resided on the lands, by permission of Richard Matson, until his death, and since by permission of Richard's administrators. They do not know what rent was paid, or to whom. The improvements on the land went to pay rent up to 1835-6. That, for the last ten years, the rent would be about two dollars per acre. There is about thirty acres in cultivation. Deponent heard Richard Matson and his wife say the lands belonged to Robert Matson.

It was admitted that the heirs of Peyton Matson, deceased, are correctly stated in the bill.

The defendants offered no evidence except the answer of Richard Matson, as heretofore set out.

We shall first enquire into the propriety of admitting the answer of Richard Matson, deceased, as exhibited by his administrators, although no objection was made by the complainants. It appears that some years prior to the filing of the present bill, the complainants instituted their bill against Richard Matson, to compel him to convey to them their respective parts of the land charged to have been purchased by Richard with the money of his father, James Matson, and devised to them by the

will of said James, then deceased.  Richard Matson, having been served with process in the suit, prepared and swore to his answer to said bill, and was only prevented from filing his answer by the voluntary dismissal of the suit by the complainants.  Sometime after this, Richard Matson removed to the State of Texas, where he continued to reside up to the time of his death, after which, the complainants exhibited the present bill against the widow, heirs and administrators of Richard Matson, deceased.  There may be no legal principle which would make the answer of Richard Matson evidence in the cause, but we are satisfied that, under the circumstances of this case, no chancellor ought to entertain the bill upon any other terms than the admission of the answer.  This bill is brought to enforce a trust, after the lapse of many years, and after the death of the two principal parties to the transactions.  At the time the first suit was instituted, R. Matson was perhaps the only individual living who was fully competent to explain and unravel the transaction, and if his account of it, verified by the solemnity of his oath, shall be excluded, it cannot operate otherwise than injurious to his representatives, who are measurably ignorant on the subject.  The amount received by him of his father to be used in the purchase of land is readily established, but who, except himself, is advised of the manner in which that money was applied?

To ascertain whether a trust has been created, it is first necessary to enquire whether the money of the individual claiming to be the *cestui que trust* has been used in the acquisition of the supposed trust property by the trustee.  For this, although not the only method by which a trust arises, is the most usual.  If A buys a farm with the money of B, and takes the title in his own name, a resulting trust is created for the benefit of B.  So, if A purchases a farm, and pays for the same, partly with his own money and partly with the money of B, and takes the title to himself, a trust springs up in favor of B, and the farm is chargeable *pro tanto*.  But if A purchase a farm and pays his own money therefor, and takes a deed to himself, with a promise that if B will, at a future day, pay him the amount of the purchase money, he will convey the farm to B, no trust is created thereby, and the contract, if parol, cannot be enforced either at law or in equity.

The evidence in this case to be found in the answer of Richard Matson, and that of his wife, with the letters of Richard Matson, addressed to his father and his brother Robert, and also in the depositions of witnesses, show most conclusively and satisfactorily that Richard Matson received a large sum of money from his father, James Matson, to be laid out in lands in the State of Missouri, and that the same,

or the greater part thereof, was so invested, and the title thereto was taken by Richard Matson in his own name. Here, then, is an undoubted trust confided to Richard Matson for the benefit of James, the father, and Robert, the brother; for, the evidence shows that a part of the land to be purchased by Richard was for the benefit and to be purchased in the name of Robert Matson.

Suppose James Matson and Richard Matson were now living, and Richard was to refuse to convey the land purchased by him for Robert Matson, could his father, James, by a bill in chancery, compel Richard to convey the land to Robert, or would Robert be the proper party to institute the suit? Richard is unquestionably the trustee, and Robert the *cestui que trust*. By what principle could James, who is the benefactor, coerce the performance of a trust beneficial alone to Robert? If James Matson could not maintain a bill to enforce Richard to convey lands purchased and held in trust for Robert, then we cannot conceive how he can, by will, devise the lands thus purchased and held, so as to enable the devisee to sue and recover the same in his own name. But Robert has conveyed his interest in these lands to the complainants, then, in an action against Richard to discharge the trust, brought by parties claiming under a release or conveyance from Robert Matson, they should have made him a party to the suit; for it is a settled principle of equity jurisprudence, that all persons having a benecial interest in the subject matter of the suit, must be made parties complainant or defendant.— How, otherwise, is he to be divested of the equitable title which he has to the lands sought to be recovered?

If it were conceded, however, that all the persons in interest were before the court, the question would arise have the complainants shown themselves entitled to have a decree in conformity with the prayer in the bill? We shall examine, briefly, the facts of the case, supposing that the complainants have presented them now as favorably as it is probable they would be capable of doing at any future period.

The evidence shows that Richard Matson received from his father, at different periods, the sum of $4,861, to be laid out in lands in the State of Missouri—a part for Robert Matson, his brother, and the other part for his father. That Richard Matson, in discharge of the trust confided to him, commenced the investment by purchasing a tract of land called the "Salt Spring," at the price of $2,000, and laid out $500 in the purchase of kettles for the manufacture of salt. Here, then, was an expenditure of $2,500 out of the $4,861 confided to him, which left a balance then in his hands of $2,361.

He paid the sum of $500 to aid his brother Peyton in paying for the land which he had purchased of O'Hara, which payment, although made without authority from his father, afterwards received his sanction. This payment, and its subsequent ratification by James Matson, is stated in the answer of Richard Matson and that of his wife, Mrs. Fuller, who was with her husband on a visit to see the elder Matson, who resided in the State of Kentucky. This sum taken from the foregoing balance, leaves still in the hands of Richard Matson the sum of $1,861.

He also paid $750 for a New Madrid certificate purchased of one C. S. Hempstead, which was located on the south west quarter of section 19, township 59, range 5 west, containing one hundred and fifty acres. This purchase is stated in the answer of Richard Matson and that of his wife, as well as in the deposition of M. D. Bates and W. Richie. This sum taken from the last balance above, leaves in the hands of Richard Matson $1,111.

He then according to the statement in his answer, as well as in the answer of his wife, applied $800 of the funds in his hands to the purchase of a tract of land for Enoch Matson, and which was subsequently deeded to him. Take this amount from the balance last above, and there remains the sum of $311.

He also states in his answer that he had purchased a number of other tracts of land, under the credit system, which then prevailed in the sale of the public lands, and paid a part of the purchase money; that afterwards he relinquished these lands, and with the proceeds $247 20, he paid the balance due on a tract of one hundred and sixty acres lying in Pike county. If this amount be allowed him and taken from the balance last above found, it would then leave a balance in his hands of $64 80. These sums, and the manner of their application are fully and explicitly set out in the answer of Richard Matson and that of his wife, and are not contradicted by the evidence in the cause, except negatively and inferentially.

If the statements in the answer of Richard Matson be not true, that he advanced $500 for Peyton Matson, and $800 for Enoch Matson, to aid them in paying for their land, they might have been disproved, at least by Enoch Matson, who is still living, and one of the complainants in the bill; if not positively, by circumstantial evidence. But no effort was made to disprove those statements, notwithstanding the answer was filed several months before the hearing of the cause, and the complainants advised that the defendants would rely in their defence upon the facts set forth in the answer.

Had there remained a balance in the hands of Richard Matson sufficient or nearly so, to cover the price of the Lear tract of land, then the evidence to be found in the letters of Richard Matson, and in the depositions of witnesses, would strongly fortify the charge in the bill. But, if he made the foregoing application of the funds placed in his hands, then his proposition to let his brother Robert have this tract of land must have been intended as a personal favor as stated in the answer, on the condition that Robert would remove to this State. If so made, it is not within the power of any court to enforce it.

In no view in which we have regarded this case, can we sanction the decree of the circuit court. By that decree the whole of the land described in the bill, amounting to near eight hundred acres, is decreed to the complainants, leaving, as the complainants' counsel contend, for Richard Matson's equal third part, the balance of the money remaining unapplied by him. Let us see what is the probable amount according to their estimate. We have already seen that the lick tract and the kettles, about which there is no dispute, cost $2,500, which taken from the whole amount placed in his hands would leave $2,361, which divided by three, would give near $800, as the share of each distributee. Now, if we estimate the eight hundred acres of land at government price, which was then two dollars per acre, making $1,600, and take this sum from the above balance it would barely leave in his hands one-third of the $2,361. But the fair inference deducible from the price of other lands purchased by Richard Matson is, that the Lear tract, which is represented as being a very superior tract of land, cost him at least three dollars per acre, which would amount to the whole balance in his hands as above, and consequently cut him off from all benefits or advantage under the will. And this too, without reference to the amount advanced by him to Enoch and Peyton Matson, who have already received, the former $800, and the latter $500, out of this fund, and should in an equitable division be held responsible therefor.

We cannot perceive how the court ascertained that the land set out in the bill, and for which a decree was rendered, constituted just two-thirds of the trust fund, neither more nor less. There was no evidence showing the original cost of the land or its present value. It may constitute two-thirds under one estimate, and greatly more or less under the other. By which was the court governed in making the decree? But it is obvious, however, that there are lands held by Richard Matson acquired by the trust fund, and to which the complainants are entitled.—

To enable them to obtain a decree, it may be necessary for them to amend their bill.

For the foregoing reasons, the decree of the Circuit Court ought to be reversed, and the cause remanded for further proceedings in that court, and the other judges concurring, [the decree is reversed and the cause remanded.